# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| JUSTIN ANGELO, | ) |
| Plaintiff, | ) |
| v. | ) Docket No. 1:15-cv-469-NT |
| CAMPUS CREST AT ORONO, LLC, | ) |
| Defendant/Third-Party Plaintiff, | ) |
| v. | ) |
| TOWN OF ORONO POLICE DEPT. | ) |
| Third-Party Defendant. | ) |

**ORDER ON THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before me is the Town of Orono Police Department's ("**OPD**") motion for summary judgment. (ECF No. 82.) Campus Crest at Orono, LLC ("**Campus Crest**") sued the OPD for breach of contract and implied contractual indemnification. Third-Party Complaint (ECF No. 30.) The OPD argues that it cannot be liable for either count because it had no contract with Campus Crest. For the following reasons, the motion for summary judgment is **GRANTED**.

**FACTUAL BACKGROUND**

The following account is taken from the parties' statements of material facts, credited only to the extent that the facts are either admitted or supported by the

record in accordance with Local Rule 56. I take the facts in the light most favorable to the non-movant.

Campus Crest owns and operates an apartment complex called The Grove in Orono, Maine. SMF ¶¶ 2-3 (ECF No. 87). After The Grove opened in 2012, there were a number of large gatherings that required a police response. SMF ¶ 4. The OPD warned Campus Crest of an Orono ordinance under which the OPD could seek reimbursement as a penalty for large gatherings that required multiple police agencies to respond. SMF ¶ 5; *see generally* Ordinances, Town of Orono, Ch. 20 art. II §§ 20:26-20:32 (2017). OPD Chief Joshua Ewing stated that the warning to Campus Crest was:

> Because you are creating an environment where these large gatherings seem to take place, we're telling you now if one takes place and we have to come up here and we have to get other agencies to help us respond to deal with that issue, we're gonna bill you for all of those officers who come up here. . . . It wasn't like we were saying, hey, let's make an agreement. We are saying, we're going to enforce our ordinance against you if we're required to come up here and deal with a large event.

Ewing Dep. Tr. 23:8-19 (ECF No. 80-1). The OPD billed Campus Crest for multiple instances when the OPD and police agencies from surrounding towns had to respond to large gatherings. SMF ¶¶ 5-6. The OPD would ask each area agency that sent officers to provide it with an invoice, and the OPD billed Campus Crest the total amounts. Ewing Dep. Tr. 34:4-25.

In 2013, before the start of the 2013-2014 school year, the OPD suggested to Campus Crest as an alternative approach that the OPD could provide special details to The Grove. The assigned officers would be on site for shifts on specified weekends at the start of the 2013-2014 academic year. SMF ¶ 7. They would enforce alcohol-

2

related laws and deter future large gatherings. SMF ¶ 7. In return, Campus Crest would pay for those officers' time according to their hourly rate. Ewing Dep. Tr. 22:1-22. Campus Crest agreed, and the special details were implemented. SMF ¶ 8. In the fall of 2013, there were no significant problems at The Grove requiring a large police response. SMF ¶ 9.

On August 7, 2014, Chief Ewing emailed Campus Crest about arranging special details again for the first few weekends of the 2014-2015 academic year. SMF ¶ 10. Chief Ewing's email provided an estimate for the cost of special detail shifts on August 31, September 4-6 (Thursday-Saturday), and September 11-13 (Thursday-Saturday), 2014. Ewing Dep. Ex. 7 (ECF No. 80-4). Each special detail would include a four-officer patrol from 6:00 p.m.-2:00 a.m., with the officers compensated at an average hourly rate of $45, for a total of approximately $1,440. Ewing Dep. Ex. 7. Chief Ewing asked Campus Crest to "[p]lease let me know as soon as possible, so that we can request assistance from other agencies in a timely fashion." Ewing Dep. Ex. 7.

Chief Ewing did not receive a response to this email. SMF ¶ 10. Chief Ewing believed, based on conversations with Campus Crest, that Campus Crest did not think it was necessary to have additional alcohol details during the fall of 2014 because the fall of 2013 had gone smoothly. SMF ¶ 11.

Chief Ewing nevertheless assigned two officers to foot patrol at The Grove on the evening of Saturday, September 6, 2014. SMF ¶ 12. These officers observed a crowd form at The Grove between two apartment buildings. SMF ¶ 13. Sometime

3

after midnight on September 7, 2014, the onsite manager at The Grove approached the officers and asked them to disperse the crowd. SMF ¶ 15. The officers called for assistance from additional officers, including from the police agencies of neighboring towns. SMF ¶ 16. Officers from at least six police agencies responded. SMF ¶ 17.

On Monday, September 8, 2014, Chief Ewing forwarded his August 7, 2014 email to Kevin Sealey, the Campus Crest Vice President of Operations, and Mr. Sealey responded the same afternoon, approving the special details as Ewing had proposed. SMF ¶ 21. Chief Ewing then additionally recommended, via email, a patrol for the evenings of September 18-20, 2014, and Mr. Sealey responded on September 9, 2014, "I do approve the additional patrols for next weekend as well as this coming weekend." Ewing Dep. Ex. 7.

The Town of Orono billed Campus Crest for the overtime hours of six OPD officers who responded to the request to disperse the crowd in the early hours of September 7, 2014. SMF ¶ 35.[1] Chief Ewing stated the intent of the OPD in making this invoice was to penalize Campus Crest, pursuant to the Orono ordinance. Ewing Dep. Tr. 34:19-25. Mr. Sealey characterized the bill as the "invoice for the special service detail through the Town of Orono for September 6th." Sealey Dep. Tr. 121:25-122:1. It is not disputed that Campus Crest paid this bill. SMF ¶ 38.

---

[1] The invoice, which included the hours of the OPD and all neighboring police agencies to disrupt the crowd, had the event line "Police Overtime Costs 09/07." SMF ¶ 35. An enclosed spreadsheet that detailed the six responding OPD officers' hourly rates and overtime adjustment is titled "Grove Special Detail." SMF ¶ 38; Sealey Dep. Ex. 6 at 56 (ECF No. 83-3). Later invoices that billed Campus Crest for eight hour shifts during the special details on September 11-13 and 18-20, by contrast, and have the event line "Police Special Details." SMF ¶ 35.

4

Campus Crest raises the same denial to several of the Town of Orono's facts, asserting that from 2012-2014, it met with the OPD and identified specific dates where additional security would be provided for a fee. *See* SMF ¶¶ 5-6, 8, 11-13, 16, 21, 23; *see also* SMF ¶ 30 (repeating the same assertion as its first additional fact). Campus Crest supports its assertion with citation to Mr. Sealey's deposition transcript, in which he merely says that Campus Crest and the OPD had agreed on specific dates to have police on the property. This testimony never identifies those specific dates nor the fee or payment structure by which Campus Crest agreed to compensate the OPD. Campus Crest cut and paste this factual denial at its peril. Not only is it unsupported by the record, but it is also non-responsive to most of the various discrete facts set forth.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To prevail on a summary judgment motion, the movant must demonstrate that there is an "absence of evidence to support the nonmoving party's case." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir. 2000). The burden then shifts to the non-movant to identify a genuine issue of material fact for trial. *Quinones v. Buick*, 436 F.3d 284, 289 (1st Cir. 2006). Courts must construe the record in the

light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

## DISCUSSION

Campus Crest's breach of contract claim and implied contractual indemnification claim against OPD both depend on the existence of a contract between the parties. Under Maine law:

> To establish a legally binding agreement the parties must have mutually assented to be bound by all of its material terms; the assent must be reflected and manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liability of the parties.

*Roy v. Danis*, 553 A.2d 663, 664 (Me. 1989). "[I]n order to prove the existence of a contract, the proponent must adduce credible evidence that an offer was made which was then accepted." *Zamore v. Whitten*, 395 A.2d 435, 439 (Me. 1978), *overruled on other grounds by Bahre v. Pearl*, 595 A.2d 1027 (Me. 1991). "An uncommunicated intention is insufficient in any case to constitute such an acceptance of a proposition as to create a binding contract. . . . [S]ilence is not a legal substitute for acceptance." *Id.* "An offeree's power of acceptance is terminated at the end of a reasonable time when no time limit is specified in the offer. 'What is a reasonable time is a question of fact, depending on all the circumstances *existing when the offer and attempted acceptance are made.*'" *Ross Green & Assocs., Inc. v. Fleet Nat. Bank,* No. CV-03-713, 2004 WL 1925529, at *2 (Me. Super. June 23, 2004) (quoting Restatement (Second) of Contracts § 41).

In its motion for summary judgment, the OPD argues that Campus Crest cannot meet its burden of establishing a contract because there is no evidence Campus Crest accepted the OPD's August 7th offer to provide a police detail on September 6-7, 2014. Campus Crest counters that Mr. Sealey's deposition testimony shows there was an agreement to provide security on the night of September 6th to the early hours of September 7th. In his deposition, Mr. Sealey testified that he had an agreement for a special detail on September 6th and 7th. But he then undercut his own testimony by saying that he did not recall a conversation specifically setting the dates and that the agreement would be contained in emails between himself and Chief Ewing. *See* Sealey Dep. Tr. 30:9-31:14; 73:24-76:15. The emails show that Mr. Sealey accepted OPD's offer for special patrols on September 8th. *See* Ewing Dep. Ex. 7. Mr. Sealey's power of acceptance must have been exercised in a reasonable time, and no reasonable juror could conclude that Mr. Sealey's September 8th email constituted acceptance for a special patrol on September 6th. I find therefore no written evidence of a contract existing on the date of the incident.

Campus Crest also contends that it had an oral agreement with the OPD. Again, Campus Crest relies on Mr. Sealey's testimony, but there is no evidence of a conversation in which the parties orally agreed to a detail on September 6th. When asked about conversations he had had with the OPD regarding special details in the fall of 2014, Mr. Sealey said:

> A. I do not recall that call. Again, I only can refer to the email where I agreed that those were the dates that I wanted to secure special services details.

7

> Q. Is it your memory that email occurred at—before September 6, 2014?
>
> A. Yes, sir.

SMF ¶ 23 (quoting Sealey Dep. Tr. 73:24-76:15). Moreover, there is evidence that Chief Ewing believed, based on conversations with Campus Crest, that Campus Crest did not think it was necessary to have additional alcohol details during the fall of 2014 because the fall of 2013 had gone smoothly. SMF ¶ 11.

Finally, Mr. Sealey points to billing for special details as evidence of the contract. But close examination reveals that the billing for the response on the early morning of September 7th was not for preventative special detail services proposed by Ewing in the August 7th email. Rather, the billing was for the response costs for an out-of-control scene. On this record, Campus Crest is unable to make out the facts necessary to establish a written or oral contract. Because there cannot be a breach where there is no agreement, summary judgment is warranted on Count One.

The implied contractual indemnification claim must also fail for lack of a contract. "In the absence of a contractual relationship between the parties, there is no basis for a claim of contract indemnity." *Burgess v. M/V Tamano*, 373 F. Supp. 839, 847 (D. Me. 1974). Campus Crest has not established the existence of a contract here before September 8, 2014. Summary judgment is therefore also warranted on Count Two.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the motion for summary judgment against Campus Crest on all remaining counts of the Third-Party Complaint.

SO ORDERED.

/s/ Nancy Torresen  
United States Chief District Judge

Dated this 30th day of April, 2018.